Susan **BRADSHAW**, Plaintiff,

v.

**GOLDEN ROAD MOTOR INN,**
et al., Defendants.

No. **CV–N–94–0074–ECR.**

United States District Court,
D. Nevada.

April 18, 1995.

Michael E. Langton of Langton & Kilburn, Reno, NV, for plaintiff.

Bruce Laxalt of Laxalt & Nomura, Ltd., Reno, NV, for defendant.

## ORDER

EDWARD C. REED, Jr., District Judge.

This is a sex discrimination case brought under Title VII by Susan Bradshaw against her former employer, the Clarion Hotel Casino in Reno, Nevada. There are pendent state statutory and tort claims. The Clarion has filed a motion for summary judgment. Doc. # 29. Bradshaw has opposed, Doc. # 19, and the Clarion has replied. Doc. # 24. The Clarion's motion will be **GRANTED.**

Bradshaw worked for the Clarion as a dealer from April 10, 1991, until she was fired on September 2, 1993. The Clarion claims she was fired because her job performance was inadequate, and, more specifically, because of her behavior during an incident on the casino floor on August 28, 1993. Bradshaw's contention, as explained below, is not entirely clear. We address first some collateral matters.

### I. Nevada Revised Statute 612.533

The parties also argue at length about the import of NRS 612.533, which provides, in relevant part, that "[a]ny finding of fact or law, judgment, determination, conclusion or final order" made pursuant to the state statutes on unemployment compensation is "not admissible or binding" in a separate suit between the employer and employee before a "court or judge of this state or the United States...."

#### A. Collateral Estoppel

We note, first, that the statute addresses two separate issues: evidence, when it states that state Employment Security Division findings are not admissible in subsequent judicial proceedings, and collateral estoppel, when it states that those findings are not binding in such proceedings. We turn first to the latter issue. Collateral estoppel in the federal courts is a question of federal law, and

[i]t is well settled that 28 U.S.C. § 1738 requires federal courts to give state court *reviewed* administrative adjudications the same full faith and credit that the adjudications would have in the state's own courts. Section 1738, however, does not require federal courts to apply preclusive effect to a state agency determination that has not been judicially reviewed. In instances where section 1738 does not require preclusive effect, federal courts ... may still apply res judicata and collateral estoppel under federal common law rules.

*Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1283 & n. 4 (9th Cir.1986) (citations omitted). As a matter of federal common law, federal courts under *Elliott* must "give preclusive effect ... to the fact-finding of state administrative tribunals." *Miller v. County of Santa Cruz,* 39 F.3d 1030, 1032 (9th Cir.1994).[1]

---

1. The Ninth Circuit goes further, extending preclusive effect to legal as well as factual issues, if the administrative agency acted in a judicial capacity and resolved disputed factual issues properly before it, and if the parties had an adequate opportunity to litigate before the agency. *Miller,* 39 F.3d at 1033 (*citing United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)).

After she was fired, Bradshaw applied for unemployment insurance benefits, which the Clarion controverted. A hearing was held before an appeals referee of the state Employment Security Division, who ruled that Bradshaw was not entitled to benefits because she had been discharged for "misconduct"—specifically, for refusing her supervisor's direct order to go to his office, and for manifesting that refusal by loud and inappropriate conduct on the casino floor, in front of customers and her coworkers. Doc. # 29 Exh. H. The referee's ruling was never reviewed by a court. Indeed, the ruling was not even reviewed within the Employment Security Division, as Bradshaw's appeal was filed late and the Division's Board of Review therefore refused to hear it. The Clarion argues strenuously and at length, *see* Doc. # 29 at 4–9; Doc. # 24 at 3–7, that because "this matter has been fully and finally adjudicated" by the Employment Security Division, Doc. # 24 at 4, we must "afford that prior adjudication res judicata effect," Doc. # 29 at 9, and dismiss Bradshaw's claims.

That is incorrect. Bradshaw's only federal claim is for sex discrimination under Title VII, and *unreviewed* state administrative proceedings have no preclusive effect on Title VII claims. *University of Tennessee v. Elliott,* 478 U.S. 788, 796, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986).[2] This result is mandated by federal common law. NRS 612.533 dictates the same result, but would come into play only if the referee's decision had been reviewed by a state court. Only then would this court, pursuant to 28 U.S.C. § 1738, look to the state statute and give the decision the same preclusive effect a Nevada court would give it, i.e., none at all.

**2.** See Heath v. John Morrell & Co., 768 F.2d 245, 248 (8th Cir.1985) (state unemployment agency had no jurisdiction over a Title VII claim, and in any event unreviewed administrative determinations have no preclusive effect on such claims); Roberts v. Las Vegas Valley Water Dist., 849 F.Supp. 1393, 1399 n. 7 (D.Nev.1994) (in Kremer v. Chemical Construction Corp., 456 U.S. 461, 466–67 & n. 6, 102 S.Ct. 1883, 1889–90 & n. 6, 72 L.Ed.2d 262 (1982), the Supreme Court "recognized an exception to its rule of issue preclusion for Title VII cases," which it reaffirmed in Elliott ); 18 Charles A. Wright, et al., Federal Practice & Procedure § 4471 (Supp.1994).

### B. *Admissibility*

We turn, then, to the more difficult question: whether the decision of the Employment Security Division's appeals referee, which has no preclusive effect, can at least be admitted into evidence. As a general rule, arbitral decisions may come into evidence and are allowed such weight as the trial court deems appropriate. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974). In *Alexander,* which involved arbitration of a discrimination claim under a collective bargaining agreement, the Court noted that the "relevant factors" in determining admissibility would include

> the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight.

*Id.* at n. 21. Though *Alexander* dealt with an arbitral decision, that case's analytical framework can be applied just as easily to a decision rendered by an agency responsible for investigating and adjudicating claims of employment discrimination as to a decision rendered by a labor arbitrator.[3]

Only a few cases address the admissibility in an employment discrimination suit of decisions by state unemployment compensation officials. The most thorough opinions are *Barfield v. Orange County,* 911 F.2d 644

**3.** The admissibility in a discrimination suit of decisions by such agencies or arbitrators is likely contested far more often than the admissibility of decisions by unemployment officials. See, e.g., Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1500 (9th Cir.1986) (in an ADEA case, admissibility of an EEOC letter of violation is within the court's discretion); Criswell v. Western Airlines, Inc., 709 F.2d 544 (9th Cir.1983) (arbitrator's decision); Plummer v. Western Int'l Hotels Co., 656 F.2d 502, 505 (9th Cir.1981) (plaintiff in a Title VII case has an absolute right to introduce EEOC probable cause determination).

(11th Cir.1990), and *Baldwin v. Rice,* 144 F.R.D. 102 (E.D.Cal.1992).[4] In *Barfield,* the plaintiff sought to exclude from evidence an EEOC report and a report of proceedings of the Florida Unemployment Appeals Commission. The court held that the EEOC report was admissible, in the trial court's discretion and in light of Rule 403, as a public record under Rule 803(8). It paid little attention to the unemployment commission's report, explaining that, because FRE 803(8) "makes no distinction between federal and nonfederal offices and agencies" and "because a finding of misconduct is clearly relevant to a charge that an employee has been fired not for any proper reason but because of racial discrimination," *id.* at 649–50 & n. 7, its analysis of the admissibility of the EEOC report applied equally to the unemployment commission's report.

In *Baldwin,* the court admitted a decision of the California Unemployment Insurance Appeals Board, for a variety of reasons:

—it was a "decision on the facts" that was "directly pertinent to the issues" in the case;

—the defendant had "participated fully in the unemployment appeals process," so the Board's decision was "not occasioned by the absence" of the defendant's input;

—any harm to the defendant could be "addressed by referring to deficiencies in the record or other evidence" which would discredit the Board's findings;

—"admissibility of evidence requires less rigorous standards than collateral estoppel," so, like an equal employment opportunity (EEO) complaint, the unemployment decision, while not given preclusive effect, could be admitted into evidence;

—in this particular case, the parties had ample incentive to litigate the unemployment claim, the unemployment decision was a part of the EEO file (which itself would be admissible), and the unemployment hearing appeared to have been more extensive and reliable than the EEO investigation.

*Baldwin,* 144 F.R.D. at 105–07. The *Baldwin* court ruled as it did despite the fact that a California statute, basically identical to Nevada's, made such unemployment decisions inadmissible.

We assume that a decision by a state unemployment board or officer is a "public record" within the meaning of Rule 803(8). We note that there may be cases in which, as in *Baldwin,* an unemployment compensation hearing has been unusually complete, with each party given a chance to participate fully and afforded the full complement of procedural protections. We note, also, that a finding by an unemployment board or officer that, say, an employee was or was not fired for "misconduct," will usually be relevant to an employment discrimination suit.

Nevertheless, we must disagree with the *Barfield* and *Baldwin* courts, essentially for two reasons. First, we think that an unemployment compensation hearing will normally fail to meet the four *Alexander* criteria. The hearing may well be procedurally fair and an adequate record may be made on the issue of discrimination. Still, state unemployment statutes are even less likely than collective bargaining agreements to contain provisions that "conform substantially" to Title VII; the question at the hearing is whether the employee is entitled to compensation under state statutes, not whether the employee was discriminated against in violation of federal law. Also, the hearing officer or board will typically have no special competence in deciding claims of discrimination.

Related to the fact that an unemployment hearing is not designed to resolve discrimina-

---

**4.** *See also Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 138 (S.D.N.Y.1987) (unemployment board's administrative law judge made a finding favorable to the employee-plaintiff; court noted only that this was admissible and would be "given weight in accordance with the nature of the administrative proceeding"); *Altman v. Port Authority of New York and New Jersey,* 879 F.Supp. 345, 349 (S.D.N.Y.1995) (jury in an ADEA case had properly considered a New Jersey Department of Labor decision that, *inter alia,* the plaintiff had been "harassed by his supervisors"). *But see Pickett v. Bamsi, Inc.,* No. C–93–20478–RMW–EAI, 1995 WL 73100, *9 n. 2 (N.D.Cal. Feb. 13, 1995) (questioning *Baldwin's* suggestion that a decision of the unemployment appeals board would be admissible in the employee-plaintiff's later discrimination suit, but noting that the parties' statements at the board's hearing might themselves be admissible).

tion claims is a serious policy concern, enunciated most clearly by our circuit:

> ... an employee's incentive to litigate an unemployment benefits claim is generally much less than his incentive to litigate a discrimination claim where generally the stakes are much higher. When the amount in controversy in the first action is much less than the amount in controversy at the second, preclusion would be unfair.

> ... the instant case involves a remedial statute 'administered informally without resort to technicalities that might deprive the unsophisticated applicant of his right to benefits.' The purpose of unemployment insurance is to assist people out of work through no fault of their own; thus, the statutory provisions 'must be liberally construed to further the legislative objective of reducing the hardship of unemployment.' Therefore, it is important that that administrative process be speedy and inexpensive so that those in need can receive unemployment benefits expeditiously.

If collateral estoppel is applied to federal issues implicitly determined in proceedings before the Unemployment Insurance Appeals Board, an employee with a federal discrimination claim might have to decide to forego state unemployment benefits rather than risk an adverse ruling that could have preclusive effect on a federal discrimination claim that he may not be adequately prepared to litigate before the Board. Moreover, the potentially higher awards at stake in discrimination claims could compel both employers and employees to litigate every unemployment benefits claim as if it encompassed a discrimination suit. Should this come to pass the Board may find it difficult to adjudicate unemployment benefit claims expeditiously. Consequently, an unemployed worker would be without benefits for a longer period of time than would be the case if his appeal had been decided without the addi-

tional delay created by determining a discrimination claim.

*Mack,* 798 F.2d at 1284 (citations omitted). The *Mack* court held that unemployment proceedings have no collateral estoppel effect in a federal discrimination suit, but the concerns expressed by the court also apply to the question whether a decision based on those proceedings should be admitted into evidence in such a suit.

■ *Evidence* introduced at an unemployment benefits hearing should, presumably, be admitted in a later lawsuit, subject to the normal rules governing admissibility. But we think that an unemployment hearing officer's *decision,* though it *may* be admitted in a federal discrimination suit, normally should not be. Unemployment benefits hearings are designed to be quick and inexpensive. If the decision resulting from such a hearing were given collateral estoppel effect in a federal lawsuit, the parties, as the *Mack* court noted, would have every incentive to turn the hearing itself into a full-blown lawsuit. The same incentives would be present, though in weaker form, if the parties knew the decision would be admitted, though not given preclusive effect, in the federal lawsuit.[5]

### II. *Hearsay*

■ The Clarion also objects, Doc. # 24 at 8–9, to Bradshaw's reliance on a deposition of Gary Harrison. Doc. # 19 Exh. 4. As explained below, this case is almost entirely about personal conflict between Bradshaw and her supervisor, Roger Hobson. Harrison worked at the Clarion with Bradshaw and Hobson. His deposition, argues the Clarion, consists of "little more than [his] recollection of statements that Roger Hobson allegedly made to him (outside the presence of the jury)." Citing FRE 801(c), the Clarion argues that, as those statements are offered for the truth of the matter stated, they are hearsay and cannot be considered.

5. We note, also, that NRS 612.533 bars admission of such decisions in subsequent judicial proceedings. That statute is, of course, not binding on a federal court, but it certainly merits consideration as an expression of the state's policy concerns. And presumably one such concern is that set forth above: that an unemployment hearing may turn into full-blown litigation if the parties know that a decision resulting from the hearing will be admissible in a subsequent discrimination suit.

That is a curious argument. The defendant is Golden Road Motor Inn, Inc., which does business as the Clarion Hotel Casino. At all relevant times, Hobson worked as a supervisor at the Clarion, and it is his alleged conduct toward Bradshaw in the course of their work at the Clarion that gives rise to this case. Thus Hobson's statements to Harrison, under Rule 801(d)(2)(D), are, with respect to the Clarion, the admissions of a party-opponent, and are therefore not hearsay.

### III. *Evidence of Discrimination*

#### A. *The Nature of the Claim*

We turn to the merits of Bradshaw's claim. The theory under which she proceeds is unclear. To the Clarion's contention that she was fired "*solely* as a result of substandard performance and open, hostile insubordination," Doc. # 29 at 13, Bradshaw replies that she was actually fired "as an object of Mr. Hobson's revenge and for opposing the harassment and discriminatory treatment she was receiving" from Hobson. Doc. # 19, at 10–11.

Later in her brief, however, Bradshaw argues that she has "set forth facts sufficient to establish that she worked in a hostile environment, hostile because of her sex." *Id.* at 22. Bradshaw claims that Hobson's actions toward her

> created an unlawful hostile environment. Mr. Hobson directed his subordinates to 'get rid of [Bradshaw],' continuously referred to [Bradshaw] in vulgar and disparaging terms, and did nothing on August 28,

1993, to prevent abusive conduct directed at [Bradshaw].

*Id.* at 24.

#### B. *The Events in Dispute*

#### 1. *The May 1, 1992 Incident*

Drawing all inferences in Bradshaw's favor, as we must, we start with her version of events.[6] The conflict between Hobson and herself, Bradshaw explains, had its origins primarily at a May 1, 1992, off-duty birthday party for Hobson's girlfriend, Cynthia Kirk. *Id.* at 13.[7] She cites Gary Harrison's recollection of the events that night, and we turn to Harrison's deposition:

Q: Now, what transpired that concerned Susan Bradshaw?

A: .... [T]here was badgering going on towards Susan from Roger. And it was basically innuendos and slams and—it wasn't any actual out and out name calling or anything like that, but it was hard to be specific on this. Oh, you this and oh, you that, no swear words, but just—more or less putting her down as an ignorant person. Verbatim I couldn't remember now what was said, but there was jab, jab, jab, jab.

Q: All by Roger towards Susan?

A: By Roger towards Susan. After dinner was over and we were all sitting there having cocktails and wine or wine or whatever, I don't exactly remember what was said, I might not have been listening at that particular time. But Susan got up and said I've had enough and left.

---

**6.** We note that the following factual narrative, with the exception of the Lampert and Hobson statements, is taken from exhibits submitted by Bradshaw herself. The Clarion submitted substantial evidence, from a variety of witnesses, which weakens Bradshaw's case even further, indicating that she did, indeed, cause a disturbance on the casino floor on the night of August 28, 1993, and that her job performance was substantially hampered by her inability to get along with customers or with her coworkers.

**7.** Harrison indicates that Bradshaw and Hobson had argued several weeks earlier, at a party at Bradshaw's house, apparently because Hobson and his girlfriend, Cynthia Kirk, were smoking in the bathroom. According to Harrison, Bradshaw told him that "she had asked them not to

smoke in her house. If they were going to continue, to leave. She said she did raise her voice. That's basically what she said." Doc. # 19 Exh. 4, at 12 ll. 19–21. This incident is not mentioned by either party in the briefing.

Also, Bradshaw alleges that, the day before the birthday party, "Mr. Hobson had taken me off the crap table and verbally assaulted me, that he had cussed at me, that he had threatened me. I repeated to Mr. Ralph Criddle, who was casino manager, exactly what Roger had said to me." Doc. # 19 Exh. 5 (Bradshaw Dep.) at 94. Unfortunately, Bradshaw does not tell *us* what Hobson said to her. A general allegation of "verbal assault" and "threats" adds nothing to her opposition to summary judgment.

And I guess a few minutes went by, and she came back in, sat down and there was an exchange of words between her and Cynthia. And maybe I said something like, well, that wasn't very long or you didn't get very far or something on that order, and Roger was giving her a real nasty beady-eyed stare and she picked up a glass of wine and tossed it in his face.

Q: How did the people react?

A: Nobody said a word for a second, she was out the door before anybody really said anything.

*Id.,* Exh. 4 at 13–14.

2. *The Period From May 1, 1992, to August 28, 1993*

Although she was not fired until almost a year and a half after the May 1, 1992, dinner, the "totality of circumstances clearly demonstrate," says Bradshaw, that she was "the object of Hobson's scorn, ridicule, and revenge" after that date. *Id.* Again, Bradshaw relies primarily on Gary Harrison's deposition:

Q: Okay. With regard to that work, how many times did you hear Roger use the reference of fucking bitch in reference to Susan Bradshaw?

A: It was pretty regular at work as well.

Q: Who would be around when he would say that?

A: Usually it was one or 2 of the floor men, usually, he wouldn't say it to dealers that I know of.

Q: But in your presence it was pretty regular and while there were other floor men?

A: It was usually somebody else there to hear it.

Q: Do you recall the names of somebody else that may have heard it?

A: Well, I am almost positive that he did say it to—in my presence and Mo's presence [Mohssen Hassanin, a Clarion supervisor], and I'm darn sure that he did say it in my presence and Mary Lyon's presence....

. . . .

Q: After the birthday party on the job, did you and Roger ever discuss Susan Bradshaw?

A: On a few occasions, yes. . . . . The one specific incident I recall was shortly after [the birthday party at which Hobson insulted Bradshaw and she in response threw wine on him] when I was standing with him and Mary Lyons in the pit, and he said I'm going to get that fucking bitch. If she ever looks cross-eyed at anybody, I want you to write her up.

. . . .

Q: Did you ever—were you ever present when Roger talked to Susan about her job performance?

A: No.

Q: Or did you ever hear Roger threaten Susan—I understand the words he said to you and Mary, did you ever hear him say similar words to Susan?

A: Not in my presence.

. . . .

A: I'm trying to think if—whenever Susan's name was brought up after [the birthday party] incident, [Hobson] never referred to her as Susan. It was always that C–U–N–T or that bitch. He didn't use her name, he called her a name. It was in reference to anything where her name was brought up. . . .

Q: Would it be fair to say that you knew that Roger was out to get her?

A: Oh, definitely. Yes.

. . . .

Q: For the ultimate purpose of termination?

A: I want to get rid of that bitch no matter what.

Q: And he told you that more than once?

A: Yes.

*Id.,* Exh. 4 at 17–21.

3. *The August 28, 1993 Incident*

Bradshaw's firing was triggered by the events of Saturday, August 28, 1993, and it is to these events that the parties devote most of their attention. Bradshaw was working that night as a "21" dealer. *Id.* Exh. 1 (Bradshaw Dep.) at 207. A player at her

table called her "you motherfucker" three times, each time, to the best of Bradshaw's recollection, in the context of losing (or "busting") at a hand of cards. *Id.* at 207–09. "Very upset at the abuse," *id.* at 212, Bradshaw called Curtis Lampert, a supervisor, over to her table and told him what the customer had said and that "something needed to be done," *id.*, although she did not ask to be taken off the table. *Id.* at 215–16. As far as Bradshaw could tell, Lampert "left the situation the way it was and left the area." *Id.* at 213.

Bradshaw began to cry but continued to deal. "The man started the abuse again and I was left on the game and nothing was done." *Id.* at 215. About five minutes later, Bradshaw called to her table a floor boss named Jason. She told him what she had earlier told Lampert. Jason, too, "left the area and did nothing." *Id.* at 216–17. Bradshaw then took her twenty minute break, which she spent in the bathroom crying. She did not explain to the dealer who relieved her why she was crying. *Id.* at 217–18.

After her break, Bradshaw, following normal procedure, returned to the podium to be reassigned to a new table. She was still crying, and explained to the supervisor at the podium, Mohssen Hassanin, that a customer had been cursing at her. After learning exactly what the customer had said, Hassanin told a security guard to have the player removed. *Id.* at 218–21. He then assigned Bradshaw to a new table. As she was relieving the dealer at that table, Bradshaw was called over to the edge of the "pit" by Curtis Lampert, who was accompanied by Hobson, the shift supervisor. *Id.* at 223–24.

Still crying, Bradshaw asked Lampert and Hobson

> how it was that management at the Clarion could let dealers cuss me out and abuse me and now let players cuss me out and abuse me and nothing is done and how could they let this harassment go on.

*Id.* at 225–26. At that point, two security guards arrived and Lampert left. According to Bradshaw, the guards had been called by Hassanin to remove the player who had ver-

bally abused her. *Id.* at 228–29. Apparently that was all that was discussed. *Id.* at 229.

Hobson, according to Bradshaw, then said "You and I are going back to the office." *Id.* at 231. Bradshaw recalls her next words as "I do not want to go to the office with you alone. I want a female or one of my peers to be with us." *Id.* She recalls Hobson then saying that "he was my boss and I did not tell him what to do, he told me what to do and I was going to the office with him now." *Id.* at 234. According to Bradshaw, Hobson then grabbed her arm or her wrist and said "You're going back to the office with me now." Bradshaw pulled her hand back and told Hobson that she did not want him grabbing her. *Id.* at 234–35.

At that point, says Bradshaw, Hobson "became very loud and yelling, very mad.... [H]e yelled at the security guards to have me removed from the property." *Id.* at 237. Nothing happened immediately. Bradshaw repeatedly asked if she was being fired, but got no response. To Bradshaw's request that a female accompany her to the office, Hobson said "he would get Mary [Lyons] or get someone," and "for me, to go up and wait for him up in the office...." *Id.* at 238–40. Bradshaw waited near the bell desk directly outside the office, decided to file a complaint against Hobson, and began to make notes about what had just happened. *Id.* at 241–42. Eventually, Mary Lyons appeared; Bradshaw at that point decided "to not go back to the office, to go directly to the security office and file a harassment complaint regarding Roger Hobson's actions." *Id.* at 244. Bradshaw was then told by Phyllis Wilbur, a Clarion manager, that she was suspended pending an investigation. *Id.* at 250.

The other witnesses substantially corroborate Bradshaw's story, but with some important differences. For example, Bradshaw argues that she was not "loudly complaining" that night. But Mohssen Hassanin, the supervisor on duty who called security to remove the player Bradshaw complained about, stated that he could not hear Hobson's voice, while Bradshaw, in her conversation with Hobson, was crying and that her voice was loud. Doc. # 19, Exh. 3 (Hassanin Dep.) at

49.[8] Lampert states that, by the time Hobson told Bradshaw they would discuss the situation in the office, rather than in the middle of a crowded casino floor on a Saturday night,

> Susan was getting very loud and dealers as well as guests were beginning to stare.... When [Hobson] asked her to leave he turned as if to escort someone out when his hand touched Susan's arm. Susan immediately turned and said "Don't grab me." She started to say all you guys saw that, he grabbed me. He can't grab me that's sexual harassment.

Doc. 29 Exh. B at 2.

### 4. *Other Evidence*

Other evidence offered by both sides provides important background to the events narrated above. Bradshaw sees her termination and treatment as part of a continuous pattern of harassment and abuse. Unfortunately, she provides details as to only one incident. At the end of 1992, she asked Curtis Lampert why she was being assigned to deal "21" instead of "dealing dice." Doc. #19, Exh. 4 (Bradshaw Dep.) at 116. His response, according to Bradshaw, was "You're a girl, you're not one of the boys. What do you expect?" *Id.*

Beyond that, Bradshaw makes only blanket allegations. As noted above, she complained to Lampert and Hobson that other dealers were cursing at her, but she does not explain who these dealers were (indeed, she refers to only one person, presumably a dealer, *id.* at 226) or what the "abuse" or "harassment" or "discrimination" consisted of, or when it took place, or in what context. She offers, in short, only conclusory, self-serving allegations, without supporting details.

---

**8.** Hassanin also explains how Lampert and Hobson came to ask Bradshaw to leave the "pit" when she had returned from her break, been reassigned by Hassanin, and was about to replace another dealer:

> A: ... [T]his guy on the table was giving her hard time and calling her names and she was crying.
> Q: Did she complain to you that nobody would do anything about it?

By contrast, the Clarion has provided ample evidence that, apart from the events set out above, Bradshaw was a problem employee—technically skilled, but unable to get along with her coworkers and customers. For example, Hassanin, though reluctant to hurt Bradshaw's feelings at his deposition, conceded that although her "work performance" was very good, "[t]he guest relation, the guest service is very poor." Exh. 3 at 50. Specifically, he had received complaints from two customers about her performance. *Id.* at 44. Joyce Walsh, her former supervisor, noted that while Bradshaw's technical skills were "very good," Doc. #19 Exh. 8 (Walsh Dep.) at 31, she was critical, in a "cutting" way, of "most everybody she dealt with...." *Id.* at 32. These statements are borne out by Walsh's written evaluation of Bradshaw, completed a full year before she was fired. *Id.* Exh. 9, at 88. Similarly, Hobson himself explained that Bradshaw had been pulled off a "21" game because of complaints from two customers "who weren't intoxicated or anything, were just upset." Doc. #29 Exh. C at 46. He also explained that Bradshaw had been pulled off of craps, and assigned to dealing "21", because of customer complaints. *Id.* at 44. (Craps and "21" dealers make the same money, because all tips, or "tokes," are split among all dealers on the shift. Nevertheless, most dealers, according to Hobson, prefer to deal craps because the game is more complex and the job more enjoyable.)

### C. *Sexual Harassment and Retaliation*

As noted above, Bradshaw's briefing is unclear, but can fairly be read as raising two claims: one for a "hostile or offensive work environment," which, if established, gives rise to liability for sexual harassment; and another for "retaliation." Neither theory has merit.

---

> A: Yes, sir.
> Q: What did she tell you?
> A: I told her, "Did you talk to Curtis or Roger?" And she said, "Yes. Nobody did nothing." "Did they see you crying like that?" So I went inside the pit. I told them Susan crying. Somebody caused it to her. And they look at me and they started outside the pit. He went to talk to her.
> *Id.* at 48.

### 1. *Sexual Harassment*

█ To survive the Clarion's motion for summary judgment on this claim, Bradshaw must show that there are genuine factual disputes as to (1) whether a reasonable woman would find the conduct complained of "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (2) whether the Clarion, once apprised of the offensive behavior, failed to take adequate remedial and disciplinary action. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1463 (9th Cir.1994).

We begin by asking what conduct it is that Bradshaw alleges created an "abusive working environment." She claims—though she makes no argument based upon this—that she told Ralph Criddle, at the time the casino manager, that Hobson had "cussed her out," "verbally assaulted" her, and "threatened" her. But Criddle apparently has not been deposed, and, as noted above, Bradshaw's allegations standing alone are vague and conclusory, not supported by any specific details, let alone by any evidence suggesting that the alleged verbal abuse was in any way gender-oriented. Also, Bradshaw argued with Hobson when she found him and Cynthia Kirk smoking in her home and told them to leave. That is personal conflict; it has nothing to do with creation of a hostile working environment, and in any event Bradshaw makes no reference to the incident in her argument.

The real conflict here, according to Bradshaw herself, began at Cynthia Kirk's birthday dinner at a local restaurant on May 1, 1992. According to Harrison, Hobson insulted Bradshaw, terming her "an ignorant person." Harrison, however, could recall only that Hobson directed "innuendos and slams" at Bradshaw. There is no evidence at all indicating the precise nature of Hobson's verbal jabs at Bradshaw, let alone suggesting that they were in any way gender-specific. The episode ended, of course, when Bradshaw threw a glass of wine on Hobson.

According to Bradshaw, it was in the period after May 1 1992 that the working environment became "hostile" within the meaning of Title VII. After that date, as noted earlier,

Mr. Hobson directed his subordinates to 'get rid of [Bradshaw],' continuously referred to [Bradshaw] in vulgar and disparaging terms, and did nothing on August 28, 1993, to prevent abusive conduct directed at [Bradshaw].

Doc. # 19 at 24. We examine these allegations in turn.

#### a. *Hobson's Desire to "Get Rid Of" Bradshaw*

█ Hobson was Bradshaw's supervisor; she threw a glass of wine on him. Whether Hobson had it coming is not the point. What matters is this: if the two did not already dislike each other, they certainly did after that incident. We may assume that, as Bradshaw alleges, Hobson planned her discharge. We may also assume that Harrison was correct when he stated, more specifically, that, after the May 1 incident, Hobson wanted to "get rid of" Bradshaw and told the supervisors to "write her up" if "she looks cross-eyed at anybody." All of that does nothing to support a claim under Title VII, for what Bradshaw does not recognize is the difference between personal dislike and sex discrimination. Judge Wisdom put the matter most succinctly: *"Personal animosity is not the equivalent of sex discrimination* and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a sex discrimination case by accusation." *McCollum v. Bolger,* 794 F.2d 602, 610 (11th Cir.1986) (emphasis added). That Hobson was "out to get" Bradshaw because he disliked her, and was able to do so, is one consequence of Nevada's at-will employment doctrine; but it says nothing about sexual harassment.

#### b. *Hobson's Verbal Epithets*

█ We turn next to Harrison's statement that Hobson routinely referred to Bradshaw as a "cunt" or a "fucking bitch." A female plaintiff subjected to gender-based insults like these this would normally not lose on her hostile environment claim at the summary judgment stage. *See Steiner,* 25 F.3d at 1464. *Steiner* is especially illuminating here: it involved a female casino dealer and floorperson harassed by her supervisor, who called her, among other things, a "dumb

fucking broad," a "cunt," and a "fucking cunt." *Steiner,* 25 F.3d at 1461; *see also id.* at 1461–64 (detailing the supervisor's scatological vocabulary).

There is, however, a crucial factual difference in this case. Here, there is *no* evidence that Hobson ever called Bradshaw these things to her face or within her earshot; nor is there any evidence that he referred to her as a "cunt" or a "fucking bitch" around the Clarion generally or to other Clarion employees generally. On the contrary: Harrison's deposition testimony, set out at length above, indicates only that Hobson used these terms to describe Bradshaw *when he was speaking with other supervisors* ("floor men"). Harrison heard Hobson call Bradshaw a "cunt" or a "fucking bitch" when Hobson was speaking with him (Harrison) or with Mohssen Hassanin, or with Mary Lyons; he never heard Hobson use those terms in Bradshaw's presence *or* in the presence of other dealers. This is implicitly supported by Bradshaw's own testimony. When she confronted Lampert and Hobson on August 28, 1993, she asked why customers and other *dealers* were allowed to "cuss her out," and made no mention of vulgar references by Hobson himself. Of course, given the context in which Bradshaw was voicing her complaint, such an omission would be understandable. Only three weeks earlier, however, Bradshaw had written a lengthy complaint to Phyllis Wilbur, the Clarion's Human Resources Director, in which she apparently complained (the letter was not submitted with the summary judgment briefing) that she had been "cussed out" by Hobson. In her deposition, Bradshaw does not explain what she means by this, nor does she otherwise indicate that she was ever called a "cunt" or a "fucking bitch" or anything similar by Hobson.

■ We may assume that the environment at the Clarion was "hostile," in the sense that Hobson wanted to fire Bradshaw. As noted above, however, personal hostility is not the same thing as "hostility" within the meaning of Title VII. Where a "hostile environment" claim rests on gender- or race-based comments, we think that the plaintiff, to show that he or she perceived the "environment" as "hostile," must at least have been *aware* of those comments, even if the person making them did not make them directly to the plaintiff. Even that is a generous approach; the cases suggest that a hostile environment claim fails where such comments are not directed at the plaintiff, who instead simply happens to overhear them.[9] Here, aside from vague and conclusory statements in her own deposition that she was "cussed out," Bradshaw has produced no evidence that she was aware that Hobson had called her a "cunt" or a "fucking bitch," nor has she produced evidence that Hobson ever referred to her in those terms in the presence of anyone other than three supervisory employees. Hobson's comments will therefore not support a hostile environment claim.

### c. The Events of August 28, 1993

■ Bradshaw complains, finally, that she was subjected to a hostile working environment on August 28 1993, because Hobson did nothing to stop the "abusive conduct" directed toward her by the customer playing at her "21" table. This claim is without merit. The customer in question said "you motherfucker" three times. Bradshaw called Lampert over. She did not ask him to take her off the table, Doc. # 19 Exh. 1 at 215–16, and Lampert, in statement he wrote that night, Doc. # 29 Exh. B at 1, indicated that he decided not to approach the customer at that time. About five minutes later, she asked a supervisor, identified only as Jason, to be relieved, and she was. Doc. # 19 Exh. 1 at 215, 217. When she returned from her break, she told Mohssen Hassanin about the

---

9. *See Steiner,* 25 F.3d at 1464 ("a race-based insult" referring to Asians "might well violate Title VII if made *to* an Asian employee") (emphasis added); *see also Burns v. McGregor Electronic Industries, Inc.,* 989 F.2d 959, 965 (8th Cir.1993) (hostile environment where plaintiff was directly called a "cunt" and a "bitch"); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1508 (9th Cir.1989) (hostile environment where female supervisor called her female employees "dog[s]" and "whore[s]"; *EEOC v. A. Sam & Sons Produce Co.,* 872 F.Supp. 29, 36–37 (W.D.N.Y.1994) (where company vice president never called female employee-plaintiff a "whore," no hostile environment where she overheard him, through the walls of his office, which were not soundproof, refer to "women in the office" as "whores").

customer who had given her a hard time. He assigned her to a different table and called security to have the customer removed. *Id.* at 218–21. He also notified Lampert and Hobson, who were in a different pit, that Bradshaw was crying because of a customer's behavior. Doc. # 29 Exh. B at 1. According to Hassanin, Lampert and Hobson immediately went to the site of the disturbance, where Bradshaw's confrontation with Hobson took place. It is difficult to see how Hobson could be charged with creating a hostile environment on this basis when, from the evidence presented, it appears that this was the first he had heard of the problem customer. We think that the chain of events that night is so trivial that it cannot possibly support a hostile environment claim against any Clarion employee. *See and compare Harris v. Forklift Systems, Inc.,* — U.S. —, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428 (7th Cir.1995) (Posner, C.J.); *Steiner v. Showboat Operating Co.,* 25 F.3d 1459 (9th Cir.1994).

### 2. *Retaliation*

 To make out a prima facie case of retaliation, Bradshaw must establish that she acted to protect her Title VII rights, that an adverse employment action was thereafter taken against her, and that a causal link exists between these two events. *See Steiner,* 25 F.3d at 1464. The order and allocation of proof in a retaliation claim follow the usual *McDonnell Douglas* framework. *Id.* at 1465.

██ Bradshaw acted to protect her Title VII rights on September 1, 1993, when she filed a complaint with the Nevada Equal Rights Commission. Doc. # 25 Exh. J. The problem is that the adverse employment action had been taken several days *earlier,* on August 28, when she was suspended pending investigation. There is some minor confusion on this point—according to her complaint, Bradshaw was actually fired on September 2, while the Clarion shows her date of termination as August 28, Doc. # 25 Exh. L—but, in any event, the "Notice of Charge of Discrimination," *id.* Exh. J, was not sent to the Clarion until October 20, long after any adverse employment action had been

taken against Bradshaw. Moreover, even if we assume that Bradshaw has made out a prima facie case of retaliation, the Clarion has responded with overwhelming evidence that it had a legitimate, non-retaliatory reason for its actions—Bradshaw's poor interpersonal skills generally, and her insubordination on August 28 in the face of a proper order from her supervisor to go to the office rather than continue their argument on the casino floor. Bradshaw has produced no evidence tending to show that this was pretextual. A similar analysis applies to Bradshaw's "in house" complaints filed with Phyllis Wilbur; there is nothing to show that her termination was a result of her filing those complaints.

### IV. *Conclusion*

The Employment Security Division's decision on Bradshaw's unemployment claim has no collateral estoppel effect on her Title VII claims. Also, it would not be admissible in a federal discrimination suit. Harrison's affidavit—at least the parts of it referred to in this order—is not composed of hearsay.

Bradshaw's claims fail on the merits. She has presented no evidence tending to show that the Clarion's actions toward her were in any way designed to retaliate for her assertion of her rights under Title VII. She has presented no evidence sufficient to create a jury question on her "hostile environment" sexual harassment claim.

This is a case about a feud between Bradshaw and her supervisor, Hobson, a feud Bradshaw was bound to lose, given her employment situation. It may be that the real genesis of this fight is revealed in Bradshaw's complaint to the state Equal Rights Commission, Doc. # 25 Exh. J, in which she alleges that Hobson had "used foul language" in addressing her, threatened her job, written her up and "otherwise harassed" her ever since she expressed her disapproval of Hobson's alleged extramarital relationship. If true, this would explain the hostility between the two, but Hobson's desire to "get rid of" Bradshaw would not constitute sexual

discrimination.[10]

Bradshaw's federal claims fail as a matter of law. We have discretion to retain the pendent state claims, but see no good reason to do so, as they are best left to the state courts.

**IT IS THEREFORE HEREBY ORDERED** that the Clarion's motion (Doc. # 29) for summary judgment is **GRANTED** as to Bradshaw's federal claims based on Title VII.

**IT IS FURTHER ORDERED** that Bradshaw's remaining claims are dismissed without prejudice.

**IT IS FURTHER ORDERED** that the clerk shall enter judgment accordingly.

---

**10.** *Cf. Freeman v. Continental Technical Services, Inc.*, 710 F.Supp. 328, 331 n. 2 (N.D.Ga.1988) (if an employee threatened to disclose a homosexual relationship with his supervisor to the supervisor's wife, friends and subordinates, and the supervisor fired the employee, it would not be because the employee was male).