**Ricardo ARROYO, Plaintiff,**

v.

**WESTLB ADMINISTRATION, INC. and Westdeutsche Landesbank, Defendants.**

**No. 96 Civ. 5574.**

United States District Court, S.D. New York.

June 16, 1999.

**226**

Akin & Smith, P.C., New York City, for plaintiff.

McDermott, Will & Emory, New York City, for defendants.

### MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Ricardo Arroyo ("Arroyo") brought this action against defendants WestLB Administration, Inc. and Westdeutsche Landesbank (collectively, the "Bank") alleging racial discrimination and unlawful termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* (Title VII), the New York State Human Rights Law ("State HRL"), N.Y.Exec.Law § 290 *et. seq.* (McKinney 1986), and the New York City Human Rights Law ("City HRL"),

N.Y.C.Admin.Code § 8–101 *et. seq.*[1] Arroyo also alleges that the Bank negligently caused him to suffer emotional distress, and that it negligently retained one of its employees. The Bank now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order dismissing the complaint. For the reasons stated below, the Court grants the Bank's motion for summary judgment, dismissing the complaint.

### I. FACTS

Arroyo, a Hispanic male, commenced employment with the Bank in January 1990 as a money market foreign exchange clerk. (*See* Defs.' Ex. 3 Arroyo Dep. at 5). During the summer of 1993, Arroyo received a job offer from another firm and resigned from the Bank. (*See id.* at 5–7). The Bank then offered Arroyo a position as a money market trader's assistant to convince him to stay. (*See id.*). Arroyo, whose goal was to become a trader's assistant, and ultimately, a trader, accepted the position. (*See id.* at 6–7). His new responsibilities included tracking the deals made by the traders with whom he worked and then inputting the trade tickets for those deals into a computer. (*See* Defs.' Ex. 4 Barton Dep. at 21–22).

Arroyo's allegations of hostile work environment are based on the following incidents.

**August 1993**

Neil Williamson, who is black, was hired by the Bank in August 1992 as a foreign exchange desk clerk to work on the trading floor. (*See* Defs.' Ex. 10; Barton Dep. at 25). Beginning in 1993, Arroyo and Williamson interacted in performing their jobs. According to Chris Doyle, who supervised Arroyo and Williamson in 1994

---

1. Courts view Section 296 of the New York Executive Law and Section 8–107 of Title 8 of the New York City Charter and Administrative Code as comparable in their prohibitions against discrimination. *See Ortega v. New York City Off–Track Betting Corp.,* 1999 WL 342353, at \*3 n. 2 (S.D.N.Y. May 27, 1999) (citing cases). The standards applied to Title VII claims are also applied to claims brought under the state and city statutes. *See id.* at \*3 n. 2, \*9.

and 1995, they were responsible for assisting each other during busy periods. (*See* Defs.' Ex. 5 Doyle Dep. at 9, 21; Defs.' Ex. 7 Williamson Dep. at 62–63).

In or about August or September 1993, Arroyo and Williamson had an argument on the trading floor, witnessed by several employees. (*See* Arroyo Dep. at 10, 14–16; Barton Dep. at 33). According to Williamson, the day of the argument was unusually busy and he claims to have asked Arroyo for help in entering the remaining trade tickets into the computer. (*See* Williamson Dep. at 12–14). He contends that Arroyo refused, spurring their argument. (*See id.* at 14). Arroyo testified at his deposition that during the argument Williamson called him a " 'fucking spic' " and " 'fucking asshole,' " and accused him of thinking only of himself. (Arroyo Dep. at 10). Williamson denies using those epithets, but admits that he said Arroyo had "moisture on his back," a reference to Arroyo's ethnicity.[2] (Williamson Dep. at 20, 25–26). After the dispute, Arroyo was told to go home by his managers. (*See* Barton Dep. at 27). Apparently, Williamson followed Arroyo to the elevator, (*see id.* at 27, 35), at which point Arroyo alleges that Williamson said: " 'We will take care of it outside and this is far from over.' " (Arroyo Dep. at 14).

The next day, Arroyo complained to Gerard Barton, the Bank's Managing Director of Human Resources. (*See id.* at 18; Barton Dep. at 26). According to Barton, Arroyo only mentioned that Williamson called him a "wetback," or something that could be interpreted as such. (*See* Barton Dep. at 28). Arroyo, on the other hand, maintains that he told Barton that Williamson called him a "spic." (*See*

Arroyo Dep. at 18). Barton conducted an investigation, meeting separately with Williamson and Doyle, who witnessed the argument. (*See* Barton Dep. at 29, 31–33, 35). He testified that Williamson's and Doyle's versions of the incident were consistent with what he alleges Arroyo told him. (*See id.* at 39). As a result of the investigation, Williamson was disciplined. Barton verbally warned him that use of racial slurs was impermissible, and documented the warning by placing a memorandum in Williamson's file. (*See id.* at 44, 46, 48–49; Ex.11). Afterwards, Williamson apologized to Arroyo and other coworkers. (*See* Arroyo Dep. at 20–21; Williamson Dep. at 36, 61).

No further incidents of discrimination are alleged until September 1994.

**September 1994**

During this time the Bank made changes in its organizational structure and to its computer system. (*See* Arroyo Dep. at 22–24; Barton Dep. at 50–52). The changes affected Arroyo's and Williamson's positions. The employees were moved from the trading floor to a back office where they sat close to one another, (*see* Barton Dep. at 50–52), and were instructed to work directly together. (*See* Arroyo Dep. at 22). Each was responsible for training the other in their respective positions. (*See id.*). Tension soon developed.

According to Arroyo, Williamson often complained that he was doing more work than Arroyo, that Arroyo was not training him properly, and that he was impatient. (*See id.* at 25). Arroyo alleges that in the context of these disputes Williamson called him an "asshole" and a "spic"[3] "a few times."[4] (*Id.* at 25–26). He further alleg-

---

**2.** For purposes of this present motion, the Bank has assumed the truth of Arroyo's testimony with respect to Williamson's alleged use of the words "spic" and "asshole." (*See* Mem. of Law in Support of Defs.' Mot. Summ.J. at p. 5 n. 2).

**3.** Williamson denies ever having made these comments. (*See* Williamson Dep. at 39). The

Bank, however, is willing to credit Arroyo's allegations for purposes of this motion. (*See* Defs.' Mem. of Law at 7 n. 3).

**4.** In Arroyo's opposition papers, he states that "[f]or the sake of argument, 'a few occasions' shall mean three, if not more." (Mem. of Law in Opp'n at 10).

es that Williamson said " 'I eat you up, I eat you boys for breakfast.' " (*Id.* at 26). Arroyo complained to Doyle about Williamson's comments "[a] number of times." (*Id.*). Arroyo testified that Doyle said he understood how difficult it was working with Williamson, and that the Bank was trying to get rid of him, but was unable to do so. (*See id.* at 26–27). Doyle, however, testified that Arroyo's complaints related to disputes regarding sharing of the workload, and that Arroyo never complained of racial harassment. (*See* Doyle Dep. at 11–12, 14–15). In any event, Doyle spoke with Williamson on several occasions about Arroyo's complaints. (*See* Arroyo Dep. at 27).

Arroyo also testified that when Doyle, who is white, was promoted, Williamson remarked: " 'Do you believe this fucking guy got a vice president job?' " (*See* Arroyo Dep. at 27). An employee also reported to Doyle that Williamson said the promotion list was " 'shaded white,' " and " 'South Africa, here at West LB.' " (Doyle Dep. at 15). Doyle believes the comments were in reference to his promotion. (*See id.*).

**September 1995**

The last alleged racial incident occurred one full year later, on or about September 25, 1995. Arroyo testified that Williamson threatened him while they were in the men's restroom. (*See* Arroyo Dep. at 30–31) Specifically, Arroyo contends that Williamson said " '[Arroyo had] to get the fuck out of [the] company' " and then threatened his life. (*See id.* at 31). Arroyo further testified that Williamson called him a "fucking spic and an asshole."(*Id.*). Williamson denies that the argument took place in the men's restroom, and using any racial slurs or threats. (*See* Williamson Dep. at 53–54, 64).

After the argument, Arroyo immediately reported the incident to Ray Grimaldi, the Bank's Operation Manager. (*See* Arroyo Dep. at 34). Grimaldi advised Arroyo to go home because it was 4:30 p.m. (*See id.*). The next day, Arroyo complained to Bar-

ton, stating that he could not tolerate the situation anymore. (*See id.* at 35). Barton began an investigation, speaking with Williamson and several others. (*See* Barton Dep. at 70–71). Afterwards, Arroyo alleges that Williamson came over to his desk, "looked [him] in the face and ... [said] 'I told you this is far from over. You are an asshole, you have to get out of this company.' " (Arroyo Dep. at 36). At this point, Arroyo went to Grimaldi's office and resigned. (*See id.*). Grimaldi then informed Barton of Arroyo's resignation. (*See* Barton Dep. at 71).

Crying hysterically, Arroyo happened to see Doyle, who lead him to a conference room. (*See* Arroyo Dep. at 36–37). Barton then joined Doyle and Arroyo in the conference room where they discussed Arroyo's resignation. (*See id.* at 38; Barton Dep. at 71–72). Barton supported Arroyo's decision to leave and indicated that he could make certain exceptions to the Bank's severance policy and outplacement services for him. (*See* Barton Dep. at 72–74). Arroyo responded that he thought it was time to leave. (*See* Arroyo Dep. at 38).

Because Arroyo resigned, Barton discontinued the investigation. (*See* Barton Dep. at 70, 76, 96–97). One week later, Barton met with Arroyo to discuss the severance package and use of an outplacement service. (*See* Arroyo Dep. at 39–40). In exchange for the severance benefits, Arroyo was to sign a release agreement. (*See* Barton Dep. at 77–78). Arroyo did not sign the agreement because he felt it did not offer him enough money. (*See* Arroyo Dep. at 42). He did, however, use the outplacement service. (*See id.*).

Arroyo also applied for unemployment benefits, but was initially denied because he had voluntarily resigned from the Bank. (*See* Pl.'s Ex. 1 & Compl. ¶ 17). Arroyo appealed the decision, which was reversed by the New York State Unemployment Insurance Appeal Board. (*See* Pl.'s Ex.1). In an opinion, dated November 28, 1995,

the Administrative Law Judge ("ALJ") wrote that Arroyo had "resigned from his position with good cause because he was subjected to harassment, racial (sic) derogatory slurs, as well as threats to his physical safety." (*Id.*).

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment should be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts, inferences, and ambiguities must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party meets his burden, the non-moving party has the burden of presenting "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. TITLE VII—HOSTILE WORK ENVIRONMENT

"Title VII prohibits discrimination on the basis of race ... with respect to the 'compensation, terms, conditions, or privileges of employment.'" *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997) (quoting 42 U.S.C. § 2000e–2(a)(1)). The Supreme Court has held that the phrase "terms, conditions, or privileges of employment" provides a cause of action for those who must work in a discriminatorily hostile environment. *See Harris v. Fork Lift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ To establish a claim, the plaintiff must show: "(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (internal quotations omitted). " '[M]ere utterance of an epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

■ Moreover, where the plaintiff alleges a hostile work environment based on racist comments or slurs, he must show "more than a few isolated incidents of racial enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986) (citations omitted); *see also Schwapp,* 118 F.3d at 110 ("[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments") (internal quotations omitted). Whether use of racial slurs constitutes a hostile work environment depends on such factors as the "quantity, frequency, and severity" of the slurs. *Schwapp,* 118 F.3d at 110–11 (internal quotations omitted).

The Bank argues that, having conceded the truth of certain facts for purposes of this motion, Arroyo is unable to show that the harassment was sufficiently severe or pervasive to recover under Title VII. It also contends that even if a hostile work

environment existed, it cannot be held liable for Williamson's conduct.

In support of his claim, Arroyo offers as evidence the decision of the New York State Unemployment Insurance Appeals Board (UIB) which found that he had resigned with good cause and awarded him unemployment benefits. The Court finds that the unemployment decision fails to raise a triable issue of fact. It is clear that "[u]nreviewed state administrative proceedings do not have preclusive effect with respect to claims brought under Title VII," *Mendoza v. SSC & B Lintas, New York,* 799 F.Supp. 1502, 1508 n. 2 (S.D.N.Y.1992) (citing *University of Tennessee v. Elliott,* 478 U.S. 788, 796, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)); *see also* N.Y. Lab. Law § 623(2). Such decisions have, however, been found admissible in federal court. *See, e.g., Altman v. Port Auth. of New York & New Jersey,* 879 F.Supp. 345, 349 (S.D.N.Y.1995) (jury may consider decision of the New Jersey Department of Labor as evidence); *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 138 (S.D.N.Y.1987) (admitting as evidence findings of Unemployment Insurance Administrative Law Judge and subsequent affirmance by the Unemployment Insurance Appeals Board).

Though admissible, the Court finds that the unemployment decision in this case is entitled to little or no weight. First, different issues are involved. The question before the ALJ was whether or not Arroyo was entitled to unemployment benefits because he resigned with good cause, not whether the Bank created a hostile work environment in violation of Title VII, which undoubtedly involves different legal standards. Further, "[u]nemployment benefit hearings are designed to be quick and inexpensive." *Bradshaw v. Golden Rd. Motor Inn,* 885 F.Supp. 1370, 1375 (D.Nev.1995). Accordingly, an "unemployment hearing officer's decision, though it may be admitted in a federal discrimination suit, normally should not be." *Id. But see Stokes v. General Mills,*

*Inc.,* 754 F.Supp. 312, 316 (W.D.N.Y.1991); *Fitch,* 675 F.Supp. at 138. The unemployment decision in this case consists of just two pages, and is based upon a hearing involving testimony taken from only two witnesses, Arroyo and an unidentified representative of the Bank. (*See* Pl.'s Ex.1). Further, as noted in *Bradshaw,* generally the hearing officer or the board has no special competence in deciding discrimination claims. 885 F.Supp. at 1374. For these reasons, the Court finds that the decision is entitled to minimal or no probative value. *See, e.g., Bradshaw,* 885 F.Supp. at 1373–75.

Based on the standards outlined above, the Court finds that Arroyo has failed to raise a triable issue of fact as to the existence of a racially hostile work environment. Even assuming the truth of Arroyo's allegations, it cannot be said that those incidents of racial discord "permeated" Arroyo's work environment. At the most, Arroyo has identified a total of approximately five or six incidents of racial animosity spanning over twenty-five months, including the first instance in August 1993, a "few times" (interpreting "few" as three or four) in September 1994 and one incident in September 1995. Further, each of the incidents was separated by a full year, during which time no racial slurs were made. Thus, the comments, while offensive and inexcusable, were isolated and sporadic in nature, failing to rise to the level of pervasiveness required to recover under Title VII. A review of case law shows that successful claims involve allegations of repeated and continuous discriminatory conduct. *Compare Snell,* 782 F.2d at 1101 (hostile work environment found: "plaintiffs were subjected to a virtual barrage of racially offensive slurs and demeaning epithets"), *and Currie v. Kowalewski,* 842 F.Supp. 57 (N.D.N.Y.1994) (hostile work environment found: plaintiff was subjected to a continuation of full frontal body hugs, other unwanted physical contact, sexual innuendos and remarks over an eleven-month period), *aff'd,* 40

F.3d 1236 (2d Cir.1994), *with Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977, 982–83 (W.D.N.Y.1996) (several incidents of racially discriminatory conduct over a three and one-half year period, separated by a month or more, were too infrequent to support the plaintiff's claim of hostile work environment), *aff'd sub nom. Shabat v. Billotti,* 108 F.3d 1370 (2d Cir.1997) (table), *and Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 301 (S.D.N.Y.1987) (three incidents of sexual harassment over a one and one-half year period too sporadic to show a hostile work environment). Like *Shabat* and *Christoforou,* the discriminatory conduct in this case lacks the prevalence required to prevail under Title VII.

In conclusion, while Williamson's comments upset and offended Arroyo, his subjective perception of the events as hostile is not enough to establish a claim. *See Harris,* 510 U.S. at 21, 114 S.Ct. 367. The conduct must be so severe or pervasive that a reasonable person would find the environment hostile. *See id.* Given the number of incidents involved, the significant gaps of time separating each incident, the nature of the comments, that they were made by a peer and that the Bank promptly responded to Arroyo's complaints, the Court finds that these incidents were neither severe nor pervasive enough to have created an objectively hostile work environment.[5] Accordingly, the Bank's motion for summary judgment dismissing Arroyo's claim under Title VII is dismissed. Because the analysis applied to Arroyo's Title VII claim applies to his claims under state and city laws, those claims are also dismissed. *See supra* note 1.

## C. CONSTRUCTIVE DISCHARGE

Arroyo also alleges that he was constructively discharged from the Bank due to his race and/or national origin in violation of Title VII. He asserts that because of the racially hostile and intimidating environment that Williamson allegedly created, he was "forced to resign from his position." (Compl.¶ 16).

A constructive discharge occurs when the employer, rather than directly terminating the employee, " 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (quoting *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). The standard is not easily met. A plaintiff does not have a remedy by simply showing that his working conditions were difficult or unpleasant. *See Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993). The evidence must establish that the "employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Id.* (quoting *Pena,* 702 F.2d at 325) (internal quotations omitted).

[10] Here, Arroyo bases his claim for constructive discharge on several random incidents of discriminatory conduct that occurred over a twenty-five month period. A reasonable person in Arroyo's shoes would not have felt compelled to resign. Additionally, because the Court finds that the facts do not establish a hostile work environment, Arroyo's claim for constructive discharge premised on the same facts

---

**5.** Having concluded that Arroyo has failed to show a hostile work environment, it is unnecessary to reach the issue of whether Williamson's conduct can be imputed to the Bank. However, the Court notes that the Bank maintains a harassment and discrimination policy, set forth in the Bank's employee handbook, which advises any employee who feels that he or she has been a victim of discrimination to notify his or her supervisor. (*See* Defs.' Ex. 8). Thus, the Bank maintains reasonable avenues of complaint. Indeed, Arroyo used those avenues of complaint by reporting Williamson to management. The Court further notes that on every occasion when Arroyo complained of Williamson's conduct to either a supervisor or Human Resources, such complaints were promptly addressed.

also fails. *Cf., e.g., Schwapp,* 118 F.3d at 112 ("factual basis for [constructive discharge claim] rises or falls on the determination of the hostile work environment facts"). Moreover, "there is a growing body of case law to the effect that '[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.'" *Shull v. Rite Aid Corp.,* 1997 WL 289460, at *8 (S.D.N.Y. May 30, 1997) (quoting *Landgraf v. USI Film Prods.,* 968 F.2d 427, 430 (5th Cir.1992), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)); *see also Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1133 (4th Cir.1995).

Finally, there is no evidence upon which a reasonable juror could find that the Bank deliberately created intolerable working conditions in order to force Arroyo's resignation. Accordingly, Arroyo's claim of constructive discharge is dismissed.

### D. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Arroyo's fourth cause of action alleges that the Bank is liable for negligent infliction of emotional distress "by failing to protect [him] from the threatening and intimidating behavior of [Williamson], ... caus[ing][him] to suffer serious and severe psychological and physical injuries." (Compl.¶¶ 26–28). The Bank argues that the claim should be dismissed on the ground that, among others, it is barred by the Workers' Compensation Law. The Court agrees and therefore does not discuss the other grounds asserted by the Bank in support of dismissal.

"In New York, recovery for accidental injuries arising out of and in the course of employment, including injuries caused by an employer's negligence, is governed by the Workers' Compensation Law." *O'Brien v. King World Prods., Inc.,* 669 F.Supp.

639, 641 (S.D.N.Y.1987); *see also Persaud v. S. Axelrod Co.,* 1996 WL 11197, at *5 (S.D.N.Y. Jan.10, 1996). To the extent that a plaintiff may recover for his injuries under the Workers' Compensation Law, this law becomes the plaintiff's exclusive remedy against his employer. *See* N.Y. Work. Comp. Law § 11 (McKinney 1992 & Supp.1999). There is an exception, however, if the plaintiff pleads injury as a result of an intentional tort "perpetrated by or at the direction of the employer." Practice Commentaries to N.Y. Work. Comp. Law § 11 at 34 (McKinney Supp.1999). In that event, the employee can maintain an action for damages. *See id.*

■ Here, Arroyo has not asserted an intentional tort perpetrated at the direction of the Bank. Consequently, he has not shown that the exception applies. The claim for negligent infliction of emotional distress is dismissed as it is barred by the exclusivity provision of the Workers' Compensation Law. *See, e.g., Persaud,* 1996 WL 11197, at *5; *O'Brien,* 669 F.Supp. at 641.

### E. NEGLIGENT RETENTION OF AN EMPLOYEE

Arroyo also asserts a claim for negligent retention of an employee alleging that the Bank, "aware of Williamson's threatening and intimidating behavior towards [him], failed to discipline [Williamson] or take any action against him to insure that his behavior toward [Arroyo] would cease." (Compl.¶ 30). For the reasons discussed above, this claim is dismissed as it alleges negligence and is therefore barred by the Workers' Compensation Law.[6]

### III. CONCLUSION

The Bank's motion for summary judgment is granted, and the complaint is dismissed.

---

**6.** Arroyo did not object to the Bank's motion to dismiss either negligence claim in its opposition papers. *(See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Summ. J.).