**John GREENE, Plaintiff,**

v.

**THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, et al., Defendants.**

**No. 99 CIV.4734 WK RLE.**

United States District Court, S.D. New York.

Dec. 9, 2002.

John Greene, Evergreen, AL, for Plaintiff, Pro Se.

Diane S. Wilner, Goodman & Jacobs, New York, for Defense Counsel.

## OPINION & ORDER

KNAPP, Senior District Judge.

Pursuant to Federal Rule of Civil Procedure 60(a), we hereby modify the original order we entered on November 8, 2002 and issue the following revised order. On June 30, 1999, *pro se*[1] plaintiff John Greene ("Greene" or "Plaintiff") filed a complaint against his former employer, defendant Columbia University, and against individual Columbia employees, defendants George Smartt[2], Franz Crook, Jim Conlon, Humberto Morchano, Terry Burdick, and former employee Larry Williams. The complaint alleged employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, the New York State Human Rights Law, and Title 8 of the New York City Administrative Code. Greene claims that he was subjected to a hostile work environment, disparate treatment, disparate impact, retaliation, and constructive discharge. Greene also brings tort claims for "menacing and harassment," negligent hiring and retention, and intentional infliction of emotional distress. On September 6, 2000, we referred the case to Magistrate Judge Ellis for case management and dispositive motions. On September 30, 2002, Judge Ellis issued his Report and Recommendation ("Report"). For the reasons that follow, we adopt Judge Ellis' Report and grant Defendants' Motion for Summary Judgment. The underlying facts are set out in Judge Ellis' Report and we presume familiarity.

A reviewing court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(C). "To ac-

---

1. Greene was not *pro se* at the time of filing, but his attorney subsequently withdrew.

2. In the parties' pleadings and motion papers, defendant's name is spelled both "Smartt" and "Smart."

cept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Nelson v. Smith* (S.D.N.Y. 1985), 618 F.Supp. 1186, 1189; see also *Pizarro v. Bartlett* (S.D.N.Y. 1991), 776 F.Supp. 815, 817. We have reviewed the Report and are convinced that there is no facial error.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

ELLIS, United States Magistrate Judge.

### I. INTRODUCTION

On June 30, 1999, *pro se*[1] plaintiff John Greene ("Greene") filed a complaint against his former employer, defendant Columbia University ("Columbia"), the trustees of Columbia University, and against individual Columbia employees, defendants George Smartt,[2] Franz Crook, Jim Conlon, Humberto Morchano, Terry Burdick, and former employee Larry Williams. The complaint alleged employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, the New York State Human Rights Law, and Title 8 of the New York City Administrative Code. Greene claims that he was subjected to a hostile work environment, disparate treatment, disparate impact, retaliation, and constructive discharge. Greene also brings tort claims for "menacing and harassment," negligent hiring and retention, and intentional infliction of emotional distress.

On March 26, 1997, Greene filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging retaliation and discrimination based on his race and color. Defendants' Affidavit in Support of Summary Judgment, dated December 2001 ("Def.Aff.") at Exh. 2. The EEOC issued a Right to Sue letter on April 30, 1999. Greene filed the instant action on June 30, 1999. The case was referred to the undersigned by the Honorable Whitman Knapp for general pretrial supervision and for dispositive motions. On December 13, 2001, the Columbia defendants[3] filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

First, Columbia defendants argue that Greene's discrimination claims are time-barred because the most recent date of discrimination is January or February 1996, and his EEOC Charge was brought in March 1997. Reply Memorandum of Law on Behalf of Certain Defendants in Support of Their Motion for Summary Judgment Dismissing the Complaint, dated January 22, 2002 ("Def.Repl.") at 4. Second, Columbia defendants argue that Greene's discrimination claims are barred by the *Faragher/Ellerth* [*Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)] defense, and therefore Columbia University is not vicariously liable for the alleged hostile work environment. Memorandum of Law on Behalf of Certain Defendants in Support of Their Motion for Summary Judgment Dismissing the Complaint, dat-

---

**1.** Greene was not *pro se* at the time of filing, but his attorney subsequently withdrew.

**2.** In the parties' pleadings and motion papers, defendant's name is spelled both "Smartt" and "Smart."

**3.** "Columbia defendants" includes all defendants except Larry Williams.

ed December 12, 2001 ("Def.Mem.") at 21. Third, Columbia defendants assert that Greene's allegations and evidence are insufficient to establish a hostile work environment. Def. Mem. at 28. Fourth, Columbia defendants argue that Greene fails to demonstrate a *prima facie* case of retaliation, and his constructive discharge claim must fail. Def. Mem. at 29. Finally, Columbia defendants state that Greene's tort claims for menacing and harassment,[4] negligent hiring and retention, and intentional infliction of emotional distress are time-barred. Def. Repl. at 4. Columbia defendants argue that Greene has not proven his *prima facie* case as to the tort claims and that, furthermore, his negligence actions are barred by the Workers' Compensation Law.

For the reasons which follow, I respectfully recommend that Columbia defendants' motion for summary judgment be **GRANTED**.

## II. BACKGROUND

### A. Greene's Employment at Columbia

Greene began his employment with Columbia University ("Columbia") in 1982 on the support staff of the Facilities Management Department. Plaintiff's Deposition Transcript ("Pl.Dep.") at 7–8; Defendants' Statement of Undisputed Facts ("Deft. Stm.") at ¶¶ 2, 3. In 1984, Greene became a Special Police Officer at Columbia. Pl. Dep. at 8; Def. Stm. at ¶ 4. By letter to George Smartt ("Smartt") dated August 27, 1997, Greene resigned his position, stating no reason for his departure. Def. Aff. at Exh. 7; Pl. Dep. at 160–161.

During the relevant time period, the individual defendants held positions in the Columbia University Department of Secu-

rity and Safety. Pl. Dep. at 324–25; Def. Aff. at 5. Smartt was the Director of the Department, Jim Conlon ("Conlon") was its Associate Director, and Franz Crook ("Crook") was the Operations Manager. Complaint ("Compl.") at ¶ 20. During the two years before Greene's departure, his direct supervisor was Sergeant Terry Burdick ("Burdick"). Affidavit of John Greene, dated March 27, 1997, attached to Def. Aff. as Exh. 3 ("Greene Aff."), at ¶ 3. Beginning about six months prior to Greene's departure, Sergeant Humberto Morchano ("Morchano") also directly supervised Greene. *Id.* at ¶ 1. Defendant and former co-worker Larry Williams ("Williams") was employed by Columbia as a Security Officer from approximately March 1996 to March 26, 1997. Def. Stm. at ¶¶ 9, 10.

### B. Facts Relating to Hostile Work Environment

#### 1. Burdick's Remarks and the Buckwheat Incident

Greene's claims of racial harassment are based on alleged incidents occurring between early 1996 and 1997. Greene asserts that in January or February 1996, Burdick, one of his direct supervisors, began treating him in a derogatory, abusive and hostile manner by calling him "Buck" and "Buckwheat," alluding to the show, "Little Rascals." Compl. at ¶ 20; Pl. Dep. at 276–77.

Greene claims Burdick used these terms repeatedly for nearly a year until January 1997. Greene Aff.; Pl. Dep. at 118, 275–78. Greene never complained of this treatment to Columbia until January 1997. Pl. Dep. at 121. He claims that Burdick's taunts were in reference to a prior incident

---

**4.** Columbia defendants' brief notes that menacing and harassment is not a cognizable tort in New York. Def. Mem. at 33–34.

in which a medical student told Greene that people like him were called "young buck" in Tennessee. *Id.* at 69–70, 326. The student was taken by Greene and Officer Kevin Carabella[5] to their supervisor, Crook, and the student repeated his comment. *Id.* at 70. Crook took the student to the Associate Dean of the Medical School, and the student was disciplined.[6] *Id.*

In January or February 1996, Burdick called Greene off his post in order to show him an advertisement that was clipped from the Sunday New York Daily News in the presence of Officers Lloyd Jackson ("Jackson") and Gilbert Rivera ("Rivera"). *Id.* at 80–81, 85–86, 89, 106, 332; Compl. at ¶ 24. The clipping advertised "Buckwheat" dolls, but the "wheat" portion of the word was crossed out. Pl. Dep. at 86; Compl. at ¶ 24. Burdick said to Greene, "This is you," adding that, "you look just like this and all black people with nappy hair." Pl. Dep. at 81. Greene responded, "You call me off my post to humiliate me and show me this?" Pl. Dep. at 81. According to Greene, Burdick laughed, smirked and walked away. *Id.* Greene later found the advertisement taped to his locker and took photos of it. *Id.* at 106; Compl. at ¶ 24; Exh. attached to Plaintiff's Response to Summary Judgment Motion. When Jackson, Rivera and another officer, Michael Zaragoza, were also present in the locker room, Burdick pointed to the advertisement, announced that he had put it up, laughed, and said to Greene, "That's you." Pl. Dep. at 111, 260. Greene complained about the incident to Crook, but Crook

told him not to worry about it since Greene was already looking for other jobs in Atlanta. *Id.* at 351.

Greene did not complain about the Burdick incidents with the Columbia Office of Equal Opportunity and Affirmative Action ("Columbia EOAA Office"), nor did he file a union grievance or file a complaint with the EEOC. *Id.* at 119. However, during this period, Greene was aware of his right to file a complaint with the State Division of Human Rights ("SDHR") and/or the EEOC, as he had filed a claim in 1991 for racial discrimination[7] which was dismissed. *Id.* at 130. He also was familiar with union grievance procedures and knew of the Columbia EOAA Office. *Id.* Greene also admits that Columbia's policy against discrimination and its procedures were posted widely around the campus and available in published forms. Def. Stm. ¶ 23–24.

Greene claims that the 1996 incident with Burdick prompted his stress-related absence from work for five days, from January 28, 1997, to February 1, 1997. *Id.* at 269–70. Greene also claims that the stress caused him to be absent from work for three weeks in January or February 1997. Greene Aff. at ¶ 14.

### 2. The Santa Claus Picture

In addition to the comments and conduct of Burdick, Greene claims that a photograph in Smartt's office in January or February 1996 also contributed to a racially hostile environment. *Id.* at 95–97, 103–

---

5. Plaintiff's Deposition Transcript refers both to "Carabella" and "Carabello."

6. Greene's deposition revealed that a similar incident occurred in 1987, when a public health student called him "a black nigger." Pl. Dep. at 68–69, 80. The then-Associate Dean for Student Affairs at the medical school witnessed the incident, and the student was

disciplined to Greene's satisfaction. *Id.* at 67–69.

7. In his 1991 complaint to the SDHR, Greene claimed he was assigned to drive a shuttle bus because of his race. Both the SDHR and the EEOC found no indication of discrimination on the basis of race. Def. Aff. at Exh. 18.

05. According to Greene, there was a picture inside Smartt's office that depicted Smartt, who is black, with white makeup in a Santa Claus costume. *Id.* at 339–40. Greene claims that because the picture was offensive and contributed to a racially hostile environment, he discussed it with Smartt before the 1996 Buckwheat incident. *Id.* at 100–03; 339–40. Greene asked Smartt to take down the picture, but Smartt did not respond. *Id.* at 102.

## C. Alleged Retaliation Against Greene

Greene claims that in December 1996, he attempted to contact Emily Lloyd ("Lloyd"), the Executive Vice–President for Administration to schedule a meeting with her. Pl. Dep. at 132. Lloyd responded to Greene by leaving a message for him at the Security Office on January 3, 1997, about their meeting time. *Id.* at 126. Around the same time period that Lloyd left the message, Morchano issued three write-ups against Greene for insubordination, dated December 21, 1996, January 3, 1997, and January 5, 1997. Def. Aff. at Exh. 14. The January 5, 1997 write-up was in the form of a typed letter from Morchano to Conlon, and it concerned an incident that happened on January 1, 1997. This letter explained that Greene had answered Morchano's question "with a tone of insubordination." Def. Aff. at Exh. 14. In his handwritten write-up dated January 3, 1997, Morchano alleged that Greene displayed insubordination against his authority another time on January 1, 1997, by saying, "Are you going to write me up as you did on Christmas?" *Id.*

As a union member, Greene was entitled to a hearing before being disciplined for the write-ups, and a hearing was scheduled for January 6, 1997. Pl. Dep. at 193. Instead of attending his union grievance hearing, Greene went to the University Ombudsperson, Marsha Wagner ("Wag-

ner"), and then to speak with Lloyd. *Id.* at 121–122, 131–32. His explanation for skipping the hearing is that he "already knew what they had in store for [him] . . . ." *Id.* at 127–28. He did, however, attend a rescheduled hearing in the second week of January. *Id.* at 49. He was not suspended, terminated, or disciplined following the hearing. *Id.* at 50, 196–197.

Greene believed that Wagner would report his concerns directly to the President of Columbia, although he knew that discussions with the Ombudsperson were confidential. *Id.* at 122. Greene testified that Wagner directed him to contact Lloyd because she oversaw his department. *Id.* at 122–23, 203. That same day, Greene went to Lloyd and described the harassment by Burdick and showed her the photographs he took of the "Buckwheat" picture. *Id.*

After their meeting, Lloyd asked Greene to memorialize his complaints in a letter, *id.* at 129, and, in a letter dated January 9, 1997, Greene made his first and only written complaint to Columbia about Burdick's racial harassment. *Id.* at 78–79. He described his attempt to lodge an informal complaint with Crook about Burdick, and stated that Crook admonished him not to "make any waves now [sic] you're about to leave the department." Def. Aff. at Exh. 19. His letter also described the low morale and mismanagement of his department. *Id.* The letter referred to other events unrelated to Greene's discrimination claim, *id.* at 183–84, 187–88, but made no mention of the Santa Claus picture in Smartt's office.

According to Greene, the write-ups in early January and the hearing were acts of retaliation for his attempt to contact Lloyd. However, he testified that virtually all acts of racial discrimination, including the "Buckwheat" teasing, ceased by January 6, 1997, after people in his department learned that he had been in contact

with Lloyd. *Id.* at 280. He claims, however, that four other acts of retaliation occurred after this date: two write-ups, an incident involving an order by Burdick and Morchano, and a suspension. Greene Aff. at ¶¶ 10–13; Pl. Dep. at 367. First, in an alleged write-up on January 18, 1997, Morchano said he saw Greene reading a newspaper while on duty. Greene says this allegation was false. Second, Greene claims that a write-up by Burdick took place sometime in January in which he was allegedly reprimanded for arriving late to his post. Greene explains that he was late because he was in a meeting with Burdick himself and Lieutenant McFarlane. Neither Greene nor Columbia has a record of these two alleged write-ups. *Id.* at 281. Third, Greene claims that on February 2, 1997, Burdick and Morchano sent him to investigate a report of trespassers, but it turned out that the "trespassers" were actually undercover police officers. Greene claims that his supervisors sent him there alone, hoping he would get into trouble. Fourth, Greene was suspended in April 1997 for two days for being off-post and arguing with McFarlane. Pl. Dep. 281–90.

### D. Columbia's Response to Greene's Complaint

Following Lloyd's receipt of Greene's January 9, 1997 letter, Beth Wilson ("Wilson") of Columbia's Office of Equal Opportunity and Affirmative Action ("Columbia EOAA") initiated several attempts to meet with Greene, who wanted an attorney present. *Id.* at 202; Def. Aff. at Exhs. 23, 24. By letter dated January 29, 1997, Lloyd informed Greene that his complaint had been forwarded to David Cohen, then the Director of Employee and Labor Relations. *Id.* at 198; Def. Aff. at Exh. 20. Wilson made several attempts to arrange a meeting with Greene, but Greene delayed until he could have his attorney present.

Greene finally appeared for a meeting on March 28, 1997, Pl. Dep. at 205–06; Def. Aff. at Exh. 24, two days after he had filed a complaint with the EEOC.

On August 27, 1997, Greene submitted his resignation letter to Columbia. *Id.* at 161; Def. Aff. at Exh. 7. On August 28, 1997, Greene began his employment with the Evergreen, Alabama Police Department. *Id.* at 161. Greene had been applying for other jobs since the middle of 1996. *Id.* at 9–13; Def. Stm. ¶¶ 11–14.

### E. Harassment of Greene by Williams

In late August 1996, Williams sexually assaulted Christine McGivor ("McGivor"), a Columbia employee, and continued to sexually harass her. Compl. at ¶¶ 30–41. Greene claims that McGivor sought Greene's assistance in informing Williams's supervisors. *Id.* at ¶ 39. Greene reported the harassment to Sergeant James Joyner, one of Williams's supervisors. *Id.* at ¶¶ 39, 42. Sometime between January 9, 1997 and February 18, 1997, Greene filed a written report with the Department of Security about the hostile work environment created by Williams. Compl. at ¶ 48.

On or about March 24, 1997, Williams threatened Greene while Greene was on duty with Jackson outside the Hammer Building. *Id.* at 145–46, 162. Williams said that he had just spoken with Smartt, who had shown him a document indicating that Greene was going to testify against Williams in a sexual harassment case. *Id.* at 146–47. Williams, accompanied by a man who lifted his shirt indicating that he had a gun, told Greene that he would kill him if he testified against him. *Id.* at 147; Compl. at ¶¶ 45–46. Greene called 911 and radioed for a supervisor. *Id.* at 147–48. Greene assisted a New York Police Department sergeant in the search for Williams and his companion. *Id.* Two days

later, Williams was suspended and terminated following a hearing on March 20, 1997, involving matters unrelated to Greene. *Id.* at 439–40, 153, 164. A restraining order was issued instructing Williams to stay away from Greene. *Id.* at 156. During the last week of June, however, Williams threatened Greene outside his home, prompting Greene to leave for Alabama the following day, fearing for his safety. *Id.* at 156–58, 162. Greene admits that Williams's threats were not racially based. *Id.* at 318.

## III. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment should not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the party moving for summary judgment has met its initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to bring forth specific facts to show that there is a factual question that must be resolved at trial. *See* Fed.R.Civ.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, the court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Id.* at 252, 106 S.Ct. 2505; *see also Pauling v. Sec. of Dept. of Interior,* 160 F.3d 133, 136 (2d Cir.1998).

In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36–37 (2d Cir.1994); *see also Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Summary judgment should be granted where no reasonable trier of fact could find in favor of the nonmoving party, *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989), thereby "dispos[ing] of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). Furthermore, when the case involves a claim of discrimination, the court should view the record in its totality, rather than in a piecemeal fashion. *Fitzgerald v. Henderson,* 251 F.3d 345, 360 (2d Cir.2001) *(citations omitted ).*

### B. Greene's Discrimination Claims

#### 1. Timeliness

Plaintiffs raising claims under Title VII are required to "exhaust available administrative remedies in a timely fashion." *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996); 42 U.S.C. § 2000e–5(e)(1)). Title VII requires the filing of an administrative complaint with the EEOC as a prerequisite to maintaining an action in the district court. 42 U.S.C. § 2000e–5(e). Because New York is a "deferral" state, meaning it has a designated local or state agency with authority to address claims of employment discrimination, the time limit for filing a charge with the EEOC is 300 days. *Id.;* 29 C.F.R. § 1601.13; *Pikulin v. City University of New York,* 176 F.3d 598, 599 (2d Cir.1999); *Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996); *Valentine v. Standard &*

*Poor's*, 50 F.Supp.2d 262, 281 (S.D.N.Y. 1999).

Unless the equitable tolling doctrines apply, acts of discrimination occurring prior to the 300 day period will be time-barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, ——, 122 S.Ct. 2061, 2077, 153 L.Ed.2d 106 (2002). However, a charge alleging a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* In the instant case, Greene filed his charge with the EEOC on March 26, 1997. Therefore, any discrete incidents of discrimination occurring before May 30, 1996, will be time-barred, unless the facts demonstrate the existence of a hostile work environment or reasons to apply the equitable tolling doctrine.

Greene has not alleged any reasons why his time for filing should be tolled. The alleged Buckwheat incident, which is central to Greene's discrimination claim, took place approximately four months prior to the 300–day cut-off, and over one year prior the EEOC charge. Greene admitted that he had been aware of the option to file with the EEOC and with the State Division of Human Rights, as he had filed an EEOC complaint in 1991 that was dismissed. Greene's only argument supporting his timeliness is that all events were part of the hostile work environment. The Court, therefore, finds no compelling reason to toll the limitations period.

The statute of limitations for a discrimination action under the New York State Human Rights Law, Executive Law §§ 290, 296 *et seq.*, ("HRL") and the Civil Rights Law of the City of New York, Title 8 of the New York City Administrative Code, ("CRL") is three years. *See* N.Y. Civ. Prac. L. & R. § 214 (McKinney 2002); *Narvarte v. Chase Manhattan Bank*, No. 96–8133, 2000 WL 547031, at *6 (S.D.N.Y. May 4, 2000). Greene filed this action on June 30, 1999, and therefore, claims for discrimination occurring before June 30, 1996, are time-barred under state and local law. The difference between the EEOC cut-off date of May 30, 1996, and the state filing cut-off date of June 30, 1996, is insignificant with regard to the disposition of plaintiff's claims. If Greene fails to establish a hostile work environment continuing violation, his claims under the HRL, CRL, and Title VII will equally be time-barred. *See Narvarte*, 2000 WL 547031, at *6 (statute of limitations analysis under Title VII was applied equally to HRL claim).

**2. Hostile Work Environment**

■ When a work environment is so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotation marks omitted); *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 436 (2d Cir. 1999). Establishing the existence of a hostile work environment involves objective and subjective components: (1) a reasonable person must find the environment to be hostile or abusive and (2) the employee must "subjectively perceive the environment to be abusive." *Harris*, 510 U.S. at 22, 114 S.Ct. 367. The Second Circuit has rejected a "reasonable African–American" standard in these cases, and instead looks to what a reasonable person in the same circumstances would perceive. *Richardson*, 180 F.3d at 436. In this case, the evidence, when construed in favor of Greene, indicates that he subjectively perceived his environment to abusive. The

Court therefore must determine whether a reasonable person would find Greene's work environment objectively hostile.

■ The Court must examine all circumstances "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Morgan,* 536 U.S. at ——, 122 S.Ct. at 2074 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Isolated incidents involving racist comments, slurs and jokes will not support a hostile work environment claim. *See Richardson,* 180 F.3d at 437. Furthermore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotations and citation omitted). Generally, the more severe the conduct, the fewer instances are required to create a hostile work environment. *Williams v. New York City Hous. Auth.,* 154 F.Supp.2d 820, 823 (S.D.N.Y. Aug.1, 2001). One racist remark would not support a hostile work environment claim, but a single assault would be enough. *Id.* at 823 (*citing Harris,* 510 U.S. at 21, 114 S.Ct. 367, and *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995), *abrogated on other grounds by Ellerth* ). Generally, for a claim to be "pervasive" it must be "'sufficiently continuous and concerted.'" *See Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002) (*quoting Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). However, "[t]here is no magic formula in this determination, nor is there a specific minimum 'number of instances below which a plain-

tiff fails as a matter of law to state a claim.'" *Richardson,* 180 F.3d at 439.

In *Richardson,* 180 F.3d 426, the Second Circuit reversed the district court's grant of summary judgment, finding that fact issues existed as to a hostile work environment. The plaintiff, a correctional facility employee, alleged several racially hostile incidents spanning a three and one-half year period. The allegations included jokes disparaging African Americans and referring to them as "niggers," "spooks," and "Buckwheats." *Id.* at 439. One supervisor referred to African Americans as "apes or baboons" and a co-worker called the plaintiff a "light-skinned nigger." *Id.* The court found that a reasonable person could find that these circumstances negatively altered the working environment. *Id.*

In *Schwapp v. Town of Avon,* 118 F.3d 106, 112 (2d Cir.1997), the court found that twelve racially-hostile incidents, several of which involved use of the word "nigger," over a 20–month period created a sufficient question of fact on the hostile work environment claim of a police officer. In addition, the court in *Williams,* 154 F.Supp.2d at 823, held that the display of a noose in the office for three days was sufficiently severe and pervasive. The court reasoned that because the noose is a symbol of physical violence toward African–Americans, it was significantly more intimidating than any racist joke. *Id.*

In contrast, in *Stembridge v. City of New York,* 88 F.Supp.2d 276, 286 (S.D.N.Y.2000), plaintiff pointed to several incidents, including being referred to as a "washroom attendant" and an "uppity nigger," and a black doll was hung on a doorframe near his workstation. The court granted summary judgment for defendants because, although the comments evinced hostility, they were no more than offensive. The court also noted that seven

incidents over three years did not sufficiently permeate the environment with racial hostility. *Id.* Similarly, in *McCoy v. City of New York,* 131 F.Supp.2d 363 (E.D.N.Y.2001), the court did not find that the evidence supported a finding of a hostile environment. There, plaintiff was written up twice, received a drawing of a rat in the mail, was called a "rat bastard," and a noose was displayed at work, along with an offensive picture of an African American with exaggerated facial features. In *Fitzgerald v. Henderson,* 251 F.3d 345, 366 (2d Cir.2001), the court found the evidence sufficient where plaintiff was subjected to harassment every day for two and a half years and the harassment during that period escalated.

Greene's hostile work environment claim is based partly on the Buckwheat incident in early 1996, in which his supervisor, Burdick, attached a photo of a Buckwheat doll to the outside of Greene's locker, saying the picture looked like Greene and "all black people with nappy hair." Burdick allegedly called him "Buck" and "young Buck" for nearly a year from January 1996 to January 1997. These comments occurred repeatedly, but not daily, according to Greene. He also alleges that the Santa Claus picture in Smartt's office contributed to the hostile work environment. Finally, Greene claims that his supervisor wrote him up several times without justification between December 1996 and February 1997. Greene admits, however, that after January 6, 1997, and his conversation with Lloyd, most discriminatory acts ceased, with the exception of a few additional write-ups. This Court must draw all ambiguities and inferences in Greene's favor and determine whether the alleged discrimination could amount to an altering of "the conditions of [Greene's] employment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367.

In *Richardson,* the incidents spanned over a three-year period and involved multiple racial epithets by several employees. Greene's allegations cover slightly more than a one-year period, but the Second Circuit has noted that there is no clear baseline of duration or number of incidents for determining whether conduct is sufficiently pervasive and severe. *Richardson,* 180 F.3d at 439. Here, the Buckwheat incident evinces racial stereotyping and offensive teasing. Taken alone, that incident would not rise to the requisite standards of severity. Nor can this Court find that the Santa Claus picture in Smartt's office would as a matter of law create abusive conditions of employment. However, the repetition of racial slurs for a one-year period, taken together with the other allegations, could meet the pervasiveness standard. Whether the alleged discrimination was sufficiently pervasive to alter the conditions of Greene's employment is an issue that this Court need not reach, because, as explained below, the *Faragher/Ellerth* defense is available to Columbia defendants.

### 3. Employer's Affirmative Defense to Hostile Work Environment

In addition to demonstrating a hostile work environment, a plaintiff must establish a specific basis for imputing the conduct that created the hostile environment to the employer. *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63 (2d Cir.1992) (*citing Meritor,* 477 U.S. at 70–71, 106 S.Ct. 2399). An employer will be liable for the discriminatory conduct of supervisors, subject to an affirmative defense. *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *see also Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. This affirmative defense is composed of two elements: (1) the employer must have exercised reasonable care to prevent and promptly correct any harassment, and (2) the plaintiff

must have "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Greene alleges that his supervisors and superiors condoned the derogatory remarks made by supervisor Burdick. Therefore, if a hostile work environment were found, the conduct of individual defendants would be imputed to Columbia, subject to the *Faragher/Ellerth* defense.

An employer does not have to prove it successfully prevented harassing behavior in order to demonstrate that it exercised reasonable care in addressing the harassing conduct. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir.2001). Columbia had an anti-discriminatory policy and procedures in place, which it publicized widely throughout the University. Greene admits that this policy was displayed around the campus. From early 1996 when the harassment began, Greene did not report the Buckwheat incident or the "buck" remarks, aside from telling Crook about the advertisement on his locker. Once Greene sought the involvement of Columbia administration in January 1997, prompt attempts were made by Columbia personnel to address his complaint. Greene does not allege that his employer knew of the discriminatory incidents prior to January 1997, and he admits that after speaking with Lloyd on January 6, 1997, the alleged discriminatory teasing ceased. At that point, Wilson diligently attempted to schedule a meeting with Greene to discuss his complaints, but Greene repeatedly postponed meeting until March 28, 1997, after he had already filed his charge with the EEOC.

The Court finds that Columbia did exercise reasonable care to prevent and address discrimination, and, in addition, Greene unreasonably failed to take advantage of preventive and corrective opportunities provided by Columbia. Because the evidence raises no factual issue as to whether Greene's employer met its duty under the *Faragher/Ellerth* defense, summary judgment should be granted in favor of Columbia as to its vicarious liability for Greene's discrimination claim.

### 4. Retaliation

 The acts of retaliation alleged by Greene took place in early 1997, and thus, this discrimination claim is not time-barred. To establish a *prima facie* case of retaliation, "the plaintiff must show '1) participation in a protected activity known to the defendant; 2) an employment action disadvantaging the plaintiff; and 3) a causal connection between the protected activity and the adverse employment action.'" *Narvarte*, 2000 WL 547031, at *11 (*quoting Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998)). Greene's act of contacting the administration at Columbia to complain about discrimination is the kind of protected activity covered by Title VII. This Court must then determine whether a causal connection exists between the write-ups that occurred in January and February 1997, and whether being written up is an adverse employment action.

The write-ups in early January occurred after Greene made an appointment to see Lloyd, but before he spoke to her on January 6, 1997. After his meeting with Lloyd, the alleged discriminatory acts ceased, but two more write-ups and a suspension occurred in the following months. Even if the Court infers a causal connection between Greene's complaint to Lloyd and these latter incidents, the retaliation claim will fail if the Court does not find that the acts constituted an "adverse employment action." Courts tend to define "adverse employment action" on a case-by-case basis. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.

1997). In *Richardson*, 180 F.3d at 446–447, the court found that severe co-worker retaliatory harassment that was condoned by supervisors was sufficient to state a *prima facie* claim for retaliation. Here, Greene's supervisors are alleged to have retaliated by writing him up without sufficient cause. At Greene's hearing following the write-ups, however, Conlon did not admonish him and did not take any disciplinary action. Greene was never terminated or denied promotion, and the offensive references to Buckwheat ceased after he complained. The alleged retaliatory conduct se to the level of "adverse" as a matter of law. Therefore, summary judgment should be granted as to the retaliation claim.

### 5. Constructive Discharge

Plaintiff also alleges that the working conditions were so abusive as to cause him to be constructively discharged. "Constructive discharge occurs when the employer, rather than directly terminating the employee, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Arroyo v. WestLB Admin., Inc.*, 54 F.Supp.2d 224, 231 (S.D.N.Y.1999) (*quoting Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)); *see also Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993).

Greene had already been searching for other employment, albeit unsuccessfully, since July 1996, over a year before he departed from Columbia. Greene presents no evidence that behavior which was longstanding suddenly compelled him to resign. Indeed, the alleged hostile acts had·ceased at the time he left. In *Arroyo*, plaintiff based his constructive discharge claim on racial insults and threats·spread over a twenty-five month period, and the court found that "[a] reasonable person in [plaintiff's] shoes would not have felt compelled to resign." *Arroyo*, 54 F.Supp.2d at 231. Even if the facts could establish a hostile work environment, Greene's claim for constructive discharge must fail. *Id.* at 231–32 (noting that constructive discharge claims are determined on the basis of the same facts as hostile work environment, and in some cases require greater severity).

## C. Greene's Tort Claims

### 1. "Menacing and Harassment"

Greene's fourth cause of action alleges menacing and harassment by defendant Williams. Greene claims that Columbia ratified Williams's menacing conduct and should be vicariously liable. Menacing and harassment is recognized in the criminal law, but is not a cognizable tort. Therefore, Greene's fourth cause of action should be dismissed as to both Williams and Columbia.

### 2. Negligent Hiring and Retention

■ A cause of action for negligence must be commenced within three years of the alleged negligent conduct. *See* N.Y. Civ. Prac. L. & R. § 214(5) (McKinney 2002). Williams was hired in or about March 1996 and terminated on March 26, 1997. The negligent hiring claim is therefore time-barred, as it occurred more than three years prior to Greene's filing in the District Court. As for the claim of negligent retention of co-defendant Williams, the Court finds that a grant of summary judgment is warranted in favor of Columbia.

"Under New York law, the doctrine of *respondeat superior* renders an employer vicariously liable for a tort committed by an employee while acting within the scope of his employment." *Tomka*, 66 F.3d at 1317 (*citing Riviello v. Waldron*, 47 N.Y.2d 297, 418 N.Y.S.2d 300, 301, 391

N.E.2d 1278 (1979)). "However, an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business." *Id.; Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 525 N.Y.S.2d 428 (3d Dep't 1988). Furthermore, plaintiff must show " 'that the employer knew or should have known of the employee's propensity for the conduct which caused the injury.' " *Daniels v. Loizzo*, 174 F.R.D. 295, 299 (S.D.N.Y.1997) (*quoting Kenneth R. v. Roman Catholic Diocese*, 229 A.D.2d 159, 161, 654 N.Y.S.2d 791 (2d Dep't 1997)).

Prior to Williams's March 1997 threats, Greene was never threatened by Williams and had no other personal knowledge of his dangerous propensities. Likewise, Columbia had no prior knowledge of dangers posed by Williams and promptly terminated his employment. Threats occurring after Williams's termination are clearly outside the scope of employment and thus do not implicate Columbia. Williams's threats against Greene related to his pending hearing for his sexual harassment of another employee. In March 1997, Williams allegedly threatened to kill Greene if Greene testified against him at the hearing. Two days later, Williams was terminated by Columbia, on grounds related to the sexual harassment charges. In view of the evidence as a whole, Greene's allegations are insufficient to raise a factual issue as to Columbia's knowledge of Williams's dangerous propensities and its liability for negligent hiring and retention.

Columbia defendants correctly argue that Greene's proper remedy for the negligent hiring and retention claim would be through the Worker's Compensation Law. *See* McKinney's New York Worker's Compensation Law, § 29(6). In *Mann v. Mass. Correa Elec., J.V.*, 2002 WL 88915, at *8 (Jan. 23, 2002), the Court noted that the plaintiff's common law negligence claims were precluded by the Workers' Compensation Law's exclusive remedy provisions. *See also Salvatore v. KLM Royal Dutch Airlines*, No. 98–2450, 1999 WL 796172, at *6 (S.D.N.Y. Sept.30, 1999) (if recovery is available under the Workers' Compensation Law, then that is the exclusive remedy, unless employer committed an intentional tort). In order for Greene to claim an exception to this exclusive remedy and have a negligent hiring claim against Columbia, he would need to show that Columbia *intentionally* directed Williams to assault him. *See Torres v. New York University*, No. 95–4106, 1996 WL 393565 (S.D.N.Y. July 15, 1996). The evidence does not indicate intentionality by Columbia and, therefore, Greene's negligence claim fails.

### 3. Intentional Infliction of Emotional Distress

The statute of limitations for intentional infliction of emotional distress is one year. *See* N.Y. Civ. Prac. L. & R. § 215; *Mariani v. Consol. Edison Co. of New York*, 982 F.Supp. 267, 273–274 (S.D.N.Y.1997), *aff'd* 172 F.3d 38 (2d Cir. 1998). This cause of action is therefore time-barred because all alleged conduct took place prior to June 30, 1998. Even if it were timely, Greene's claim fails to meet the standard of "extreme and outrageous conduct" required by the law. *Wahlstrom v. Metro–North Commuter R.R. Co.*, 89 F.Supp.2d 506, 529 (S.D.N.Y.2000) (*quoting Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir.1999)). Under New York law, "there will be no liability unless 'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' " *Id.* (*citations omitted*). Admittedly, the conduct alleged by Columbia defendants evinces racial stereotyping and remarks that a reasonable person could find offensive. Howev-

er, the allegations do not rise to the level of being "atrocious" and "intolerable" as required under New York law. In addition to "extreme and outrageous conduct," plaintiff must show "intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; a causal connection between the conduct and the injury; and severe emotional distress." *Id.* Greene has not alleged facts that give rise to a clear inference of intent to cause, or recklessness causing, emotional distress. Thus, this claim fails as a matter of law.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends that defendants' motion for summary judgment be **GRANTED.**

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Whitman Knapp, 40 Centre Street, Room 1201, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) *(per curiam)*; 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed.R.Civ.P. 72, 6(a), 6(e).

September 30, 2002.